3:23-mj-00177

DISTRICT OF OREGON, ss:　　　　　　　　　　AFFIDAVIT OF KEVIN McCARLEY
COUNTY OF MULTNOMAH

## Affidavit in Support of a
## Criminal Complaint and Arrest Warrant

I, Kevin McCarley, being first duly sworn, hereby depose and state as follows:

### Introduction and Agent Background

1.　　I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code. I am currently employed as a Task Force Officer with the Drug Enforcement Administration (DEA), United States Department of Justice, and have been so employed since September 2021. I am currently a detective with the Salem Police Department and have been employed in law enforcement since 1997. In that capacity, I investigate violations of the Controlled Substances Act, Title 21, United States Code, Section 801, et. seq. Until September 2021, I have been assigned to the Salem, Oregon Resident Office. I attended 320 hours of basic police training at the Oregon Department of Public Safety in Monmouth, Oregon. During my tenure as a police officer I have worked approximately 11 years of street level drug investigations. I am familiar with investigations of drug trafficking organizations, methods of importation and distribution of controlled substances, and financial investigations. I have assisted with multiple investigations involving organizations trafficking several controlled substances to include marijuana, cocaine, heroin, methamphetamines, fentanyl and MDMA. In each of these investigations, I have participated in directing the course of the investigation.

### Purpose of Affidavit

2.　　This affidavit is submitted to support a criminal complaint and arrest warrant for

Juan Carlos Cerezo, male, date of birth xx/xx/1999 (hereinafter "CEREZO"), for possession with intent to distribute methamphetamine and cocaine in violation of Title 21 United States Code, Section 841(a)(1) and 841(b)(1)(C).

3. I have obtained the facts set forth in this affidavit through my personal participation in the investigation described below; from oral and written reports of other law enforcement officers; and, from records, documents and other evidence obtained during this investigation. I have obtained and read official reports prepared by law enforcement officers participating in this investigation and in other related investigations.

4. On October 5, 2023, at approximately 12:11 p.m., Oregon State Trooper Show conducted a traffic stop on a 2023 Chevrolet Equinox as it traveled northbound on Interstate 5 near milepost 172. Trooper Show stopped the Chevrolet Equinox after he observed it commit a traffic violation, following too closely behind the vehicle in front of the Chevrolet Equinox. After Trooper Show initiated his lights, the Chevrolet Equinox pulled over to the side of the road. During the traffic stop, Trooper Show contacted the driver, CEREZO. Also in the car was the front passenger, Angela Ortiz-Alvarado, and a small child. Oregon DMV records show that both CEREZO and Ortiz-Alvarado are listed as the registered owners of the vehicle.

5. During the traffic stop, Trooper Show learned that CEREZO had a suspended driver license and asked CEREZO to talk with Trooper Show at his patrol car. CEREZO complied. While talking with CEREZO, Trooper Show asked CEREZO where he was coming from. CEREZO stated they were coming from Redding, California. Trooper Show had contacted an intelligence analyst and learned through license plate readers that the Chevrolet Equinox had been in the area of San Bernardino, California, the previous evening. San Bernardino is in southern California, hundreds of miles south of Redding, California.

6.      Trooper Show then contacted Ortiz-Alvarado in the vehicle and asked her where they were coming from. Ortiz stated they were coming from San Diego, California. Trooper Show noted the discrepancy in the responses provided by CEREZO and Ortiz-Alvarado, which were inconsistent with each other and did not reconcile with the information from the license plate readers showing that the Chevrolet Equinox had traveled from San Bernardino.

7.      Trooper Show confronted CEREZO about lying about his travel, adding that he suspected CEREZO was involved in transporting illegal drugs. Trooper Show asked CEREZO for consent to search the vehicle, which CEREZO denied. Trooper Show had his trained K9 in his patrol vehicle and told CEREZO he would use his narcotics K9 to sniff CEREZO's vehicle. Trooper Show observed that at the mention of the K9, CEREZO appeared worried. CEREZO asked Trooper Show if theoretically he (CEREZO) did have something in the car what would happen. Trooper Show told CEREZO that it depended on how much CEREZO had. Trooper Show said if there was a small amount of drugs the detectives that investigate small amounts of drugs would be contacted. Trooper Shower further said that if it was larger amounts of drugs, detectives that investigate that level would want to speak with him. CEREZO then told Trooper Show that someone put a duffel bag and a bag in his car, but he (CEREZO) didn't know what exactly was in the bag.

8.      Trooper Show then contacted Ortiz-Alvarado and her child and asked them to walk to his patrol car. Trooper Show then advised both Ortiz-Alvarado and CEREZO of their rights according to Miranda. Trooper Show then deployed his narcotics K9 around the perimeter of the Chevrolet Equinox. Trooper Show's K9 is trained to detect the odors of methamphetamine, cocaine, heroin, and fentanyl. Trooper Show reported that his K9 alerted to an odor it was trained to detect on the rear hatch door of the Equinox, below the license plate.

**Affidavit of DEA TFO Kevin McCarley**                                              **Page 3**

9.      Following the K9 alert, Trooper Show searched the rear of the vehicle. Inside the Chevrolet Equinox he located a black duffel bag in a natural void in the rear of the car by the spare tire. This bag contained seven plastic packages with a white crystal substance inside. Each of the seven packages was similar in appearance and size. Officers weighed two of the packages, each weighing slightly more than one pound. In total, I believe the seven packages weigh approximately seven pounds without DEA evidence packaging. One of the seven packages seized was field-tested and provided a presumptive positive result for the presence of methamphetamine.

10.     In the rear cargo area of the vehicle, amongst other luggage, Trooper Show located a paper shopping bag that contained a package wrapped in clear plastic with white powder inside and another package wrapped in plastic with black and brown packaging beneath it. Officers later performed field tests on each of these packages which returned presumptive positive results for the presence of cocaine. The approximate weight of these two packages without DEA evidence packaging was approximately 1.8 kilograms.

/ / /


/ / /


/ / /


/ / /


/ / /

**Affidavit of DEA TFO Kevin McCarley**                                                                                                **Page 4**

11. Based on my training and experience, I know that this quantity of methamphetamine (about 7 pounds) and this quantity of cocaine (about 1.8 kilograms minus packaging) is for distribution rather than for personal use.

*/s/ By Phone*
KEVIN MCCARLEY
DEA Task Force Officer

Subscribed and sworn in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone at 10:37 (a.m)/p.m. on 6 day of October, 2023.

HONORABLE JOLIE A. RUSSO
United States Magistrate Judge